ALTSCHUL v. HOGG et al.

(Circuit Court, D. Oregon. June 1, 1894.)

No. 2,014.

QUIETING TITLE—NATURE OF CLAIM.

W., complainant's grantor, granted to H., for two years, power to sell certain land, for not less than $445,000, H. to have 90 per cent. of any amount obtained in excess thereof. On the last day of the two years, H. came to W., stated that he had sold to defendant corporation for $445,000, that T., who was with him, was its attorney, and demanded a deed. W. said he would give it as soon as possible, and sent for his attorney. The next day W. sent to H. for any contract he had made, but none was furnished. T. stated that he did not think there was any in writing, and had not been informed of the terms of any that had been made. He was informed that if any had been made, with reasonable time for preparing deed, W. would be glad to carry out its terms. Seven years thereafter, defendant began actions for specific performance and breach of contract, which have not been prosecuted and are still pending. During the two years to which the power was limited, H., claiming to act thereunder, executed to defendant, for a consideration of five dollars, an option on the land. Thereafter he executed to it a deed thereof, for five dollars, dated within the two years, but acknowledged long thereafter. H. said nothing to W. about these instruments, but, after the date thereof, stated that he was negotiating for a sale. Between the date of the option and deed, defendant executed a mortgage of the land, reciting that it had the right to become the purchaser on payment of $600,000; and, by its answer in this suit to have any claim of defendant to the land declared void, it alleged that the tender claimed to have been made by H. by certified check was $600,000. H. was the president and principal stockholder of a corporation which owned most of the stock of defendant. During the 10 years since the expiration of the power of H., the owners of the land have made large and necessary expenditures in connection with the land, which defendant has not paid for, and does not offer to pay. Defendant, moreover, is insolvent. Held, that complainant is entitled to a decree.

Suit by Charles Altschul against T. Egenton Hogg, the Willamette Valley & Coast Railroad Company, and others. Decree for complainant.

Henry Ach and C. E. S. Wood, for plaintiff.
Wallis Nash, for defendant C. C. Clark, receiver.

BELLINGER, District Judge.   This is a suit to declare void any.
claim of right on the part of the defendants to lands comprising a
grant to the Willamette Valley & Cascade Mountain Wagon-Road
Company, and to enjoin the defendants, or either of them, from as-
serting any claim or right in such lands adverse to plaintiff's claim
therein.   The controversy is between the complainant and the
Willamette Valley & Coast Railroad Company, by its receiver.   The
complainant's title comes from one Alexander Weill.   The railroad
claims under a contract of sale made by T. Egenton Hogg, as the
attorney in fact of Weill.   Prior to the execution of this power, the
legal title to the lands in question was in one Clark, by conveyance
from the road company for Hogg, Weill, and himself.   Clark con-
veyed to one Cahn, in trust for himself, Hogg, and Weill.   On Feb-
ruary 18, 1879, Hogg conveyed to Weill all his right and interest in
the land grant, and in the stock, franchises, and property of every
description of the road company and of the Deschutes River Bridge
Company.   On the 9th of the following April, Weill acquired the
interest of Clark in the properties in question from Clark's heirs and
widow.   By the agreement of sale under which Weill acquired
Hogg's interest in the property, it was stipulated on the part of Weill
as follows:

"Said Weill grants to said Hogg full and irrevocable power for a term of
two years, commencing on January 1, 1879, and ending January 1, 1881, in
which to negotiate and conclude a sale of all the lands, stocks, and franchises
of said wagon-road company; provided, that no sale shall be made for a sum
or amount of money less than ($445,000) four hundred and forty-five thousand
dollars, which amount is now estimated as a sum equal to all the outlays, ad-
vances, payments, charges, expenses, and disbursements with which the prop-
erty will be chargeable, for principal and interest, at the date of any sale
which may be made by said Hogg within the period aforesaid; and any avails
or realizations that may be realized or received upon any such sale in excess
of said sum of $445,000, and the further sum of all the charges, expenses, out-
lays, disbursements, and amounts that shall be hereafter expended, paid, laid
out, and incurred in selecting the lands and procuring the certification thereof,
provided for in this agreement, including the sum of all taxes that may be as-
sessed on said lands, with interest at the rate of five (5) per cent. per annum
charged thereon, shall be divided between the parties hereto in the following
proportions, that is to say:  To said Weill ten per cent. of all avails of such
sale over and above the aforementioned sums and the expenses of negotiating
the sale, and the remainder to said Hogg.  And said Alexander Weill cove-
nants and agrees that, upon any such sale of the said property being concluded
by said Hogg as is herein provided, he will convey, or cause to be conveyed,
to the purchaser or purchasers the legal title to the extent of all the interest
he now has, or may at any time hereafter acquire, of, in, and to the said lands
and property, free of all incumbrance committed or suffered by him; but, in
case said Hogg shall fail to negotiate and conclude a sale of all the said lands
within the said time, his said power to sell as aforesaid shall cease and deter-
mine on the 1st day of January, 1881; and time is agreed to be of the essence
of this provision."

This is the power under which the railroad company now claims.
By this agreement, Hogg bound himself to act as land agent, at
Weill's expense, to select the most desirable lands within the grant
to an amount of not less than 400,000 acres, nor more than 600,000

acres. On the last day that this authority had to run (December 31, 1880), Hogg presented himself to Weill in the city of New York, where both were living, and announced that he had sold the lands in question for $445,000, for which sum he professed to have a certified check, which he offered Weill, at the same time demanding a conveyance of the lands and rights which he claimed to have sold. According to Weill's testimony, he informed Hogg that it was impossible to comply at once with this demand, but that, if time was given to have a deed prepared, he would comply with such demand; and he requested an opportunity to examine any contract of sale entered into by Hogg as Weill's attorney. Upon this, and while Weill was in the act of sending a clerk to request the presence of his attorney, Hogg and Mr. Turner, attorney for the Farmers' Loan & Trust Company, and another gentleman who had accompanied Mr. Hogg to Mr. Weill's office, departed. In October, 1887, the Willamette Valley & Coast Railroad Company, by Hogg, as its president, began an action in the supreme court of New York against Weill and those associated with him in business for damages for failure to make a conveyance of the property in question in pursuance of Weill's alleged contract of sale made by Hogg, as his attorney in fact. Shortly afterwards the company began in the same court a suit in equity to compel a specific performance of the same contract. In this case, as in the other, Hogg verified the complaint as the president of the plaintiff company. These proceedings have not been prosecuted, and are still pending. The Farmers' Loan & Trust Company is made defendant herein, as the mortgagee of all the property and rights of the Willamette Valley & Coast Railroad Company. The Oregon Pacific Railroad Company has no apparent relation to the matters in controversy. It is a party with the other company in the deed of mortgage to the loan and trust company, and this probably explains why it is joined as a defendant in this suit. All the parties, with the exception of the Willamette Valley & Coast Railroad Company, have suffered decrees pro confesso to be taken against them. On September 29, 1880, Hogg, in his own name, entered into a contract with the Willamette Valley Company whereby he sold, for the expressed consideration of five dollars, to the company, "the right and option to become the purchaser" of the land grant. It is recited in the contract that the option so sold is "under a certain agreement, dated the 18th day of February, 1879, and made between Alexander Weill, of the first part, and T. Egenton Hogg, of the second part." He reserves in this contract 10,000 acres to provide against contracts made by the original owners. In the mortgage deed to the Farmers' Loan & Trust Company, already referred to, it is recited that the Willamette Valley Company has acquired the right to become the owner of the road grant and stock of the road company and Deschutes Bridge Company, "which stock and lands are subject, before the title thereof can be acquired by the said Willamette Valley & Coast Railroad Company, to the payment of six hundred thousand dollars." The Willamette Valley Company duly executed this instrument, containing this recital of its rights to become the purchaser of the property in question, "subject, before the

title thereof can be acquired by the said  *  *  *  company, to the payment of six hundred thousand dollars." Notwithstanding this, Hogg, in Weill's name, as attorney in fact, by a deed dated November 3, 1880, for the .consideration of five dollars, undertakes to convey absolutely the property in question to the Willamette Valley Company. The acknowledgment to this deed is dated March 28, 1882. No intimation of either of these sales was given to Weill. In the latter part of the same month, November, 1880, Hogg called at different times at the office of Weill, and stated that he was negotiating for a sale of the property to certain parties, represented by a Mr. Short, and, finally, that such negotiations had failed. On December 30, 1880, Hogg sent a letter to Weill, in which he said:

"If my parties should be able to provide the money to complete the purchase of the wagon-road company's lands, etc., will you accept payment in a check or checks certified by the Chemical Bank, City Bank, Bank of New York, Bank of Commerce, or any banks of like standing? Please send answer at foot of this, and oblige  *  *  *."

Weill answered this letter in the affirmative. Hogg's letter, in his own handwriting, is in evidence. If the phrase, "my parties," in this letter, refers to the Willamette Valley Railroad, it is, of course, impossible that Hogg should have completed a sale and made a conveyance of the property nearly two months before he had ascertained whether such parties would "be able to provide the money to complete the purchase." If he sold and conveyed when the parties were not able to provide the money to pay for the property sold, he acted in violation of the trust reposed in him, and in excess of his authority. If, as is probable, the deed dated November 3, 1880, was in fact executed on March 28, 1882, the date of its acknowledgment, it is evidence of a fraudulent contrivance between Hogg and the pretended vendee company to effect a transfer of the land grant to the latter. There is no explanation of these facts consistent with fair dealing. It is probable that the deed dated November 3, 1880, was in fact executed on the date of its acknowledgment,—March 28, 1882,— and that it was in consequence of the discovery by Hogg that, while he had pretended in the instrument of September 29, 1880, to transfer his "right to purchase under his agreement with Weill," that agreement gave him no such right, but simply made him Weill's attorney in fact to make sale of the grant, and, moreover, while, as such attorney, he was authorized to sell for $445,000, yet he was liable to account to his principal for 10 per cent. of whatever amount the property sold for, no matter how much above $445,000 that figure might reach. If, therefore, the sale of his so-called "option" should be construed to be within the "power," he would be liable to account for 10 per cent. of the difference between the $445,000, for which he was authorized to sell and the $600,000 consideration agreed to be paid. These considerations probably suggested the device of an absolute conveyance for $445,-000, antedated so as to appear to have been executed during the continuance of the power. Hogg became a large stockholder in the Willamette Valley Railroad Company in August, 1880,

and immediately or shortly thereafter transferred his stock in such company to the Oregon Pacific Railroad Company, receiving in return, as the purchase price for such transfer, a large amount of paid-up stock in the latter company, and becoming its president. It appears from the recitals in the mortgage deed executed by the two companies to the Farmers' Loan & Trust Company in October, 1880, that the Oregon Pacific Company was the owner of at least seven-eighths of the stock of the Willamette Valley Company. Hogg, as a large stockholder in and president of the Oregon Pacific, which owned seven-eighths of the stock of the Willamette Valley Company, was, in effect, a large owner in the latter company. The two companies were one property, and were necessarily under one control. Under these circumstances, Hogg could not represent Weill in a contract with the Willamette Valley Company. If the rule was otherwise, the relation of Hogg to the alleged purchasing company, with the other facts in evidence, is conclusive of the mala fides of the particular transaction.

As already stated, upon receipt by Weill, on December 30th, of Hogg's letter asking if a certified check for the money would be accepted if his (Hogg's) parties should be able to provide the money to complete the purchase of the lands, Weill answered that it would. On the forenoon of the succeeding day, Weill sent Hogg a second letter, stating that he is led to think from Hogg's note of the preceding day that he (Hogg) may avail himself of "the refusal" which he has for the lands in the agreement of February, 1889, and requesting that anything to be signed by Weill be handed to him at once, so that he may submit the same to his attorney. There was no answer to this letter, but thereafter Hogg appeared with Turner and another gentleman in Weill's office, and made the following statement: "Here is a certified check for $445,000 for your Oregon property. I have sold it to a company which Mr. Turner here represents as attorney. I wish you would give me a deed for the property at once,"—to which Weill answered, in substance, that he was ready to do so within a reasonable time, and he added: "But you must only ask of me that which is possible. If you are acting in good faith, we will certainly come to a satisfactory conclusion." Weill turned to a clerk, whom he requested to run over to his lawyer's office, and ask him to come at once; but in the meantime Hogg and his companions left the room. It is contended that Hogg's statement amounted to a tender of $445,000, and that Weill's failure to produce a properly executed deed on the instant, conveying, by exact description, several hundred thousand acres of land to a grantee whose purchase and name had just been made known (Weill testified that the name of the pretended purchaser was not stated), places Weill in default, and entitles the defendant to be considered as the equitable owner of the lands in question. It is not worth while to consider such a claim. Hogg well knew that Weill could not produce, executed for delivery, the required deed at a moment's notice, and that he was under no obligation to do

so; and the demand, with its attendant circumstances, shows that he did not expect a deed, nor want one. Whether he in fact had a certified check can never be known. He could safely produce such a check, or assume to produce it, without risk of being required to deliver it, when he required an impossible thing as a condition of delivery. If he had in fact been ready to pay the $445,000, he would have been willing to receive a deed as soon as it could be prepared. Weill immediately sent a letter to Hogg's office, asking to be allowed to inspect any contract of sale that had been made, adding: "Thus far I have had no intimation as to the terms, nor even the name of the purchaser. An immediate reply will oblige. * * *" To this, Hogg answered that the purchaser was the Willamette Valley Company; that he had frequently told Weill this before, and had told him the same' thing at the meeting between them that day. The request in the letter of Weill to be allowed to see the contract made in his name was not referred to in Hogg's answer. Mr. Turner was referred to by Hogg as the attorney for the purchaser, the Willamette Valley road, whose owner was the Oregon Pacific, whose president and large stockholder was Mr. Hogg. Mr. Turner was within a few days called upon by Mr. Weill's attorney, in the spirit of carrying out any reasonable agreement of sale that had been made. But Mr. Turner said he had not seen the agreement between Hogg and Weill, and was not aware of its contents; that he was of the impression there was not any contract in writing between Hogg and the alleged purchaser; and that he had not been informed as to the terms of that contract (the contract claimed to have been entered into between Hogg, acting for Weill, and the company whom Turner represented as attorney). Weill's attorney informed Turner that if there had been an actual sale, with a reasonable time to procure the deeds, they would be very glad to carry out its terms. It does not appear that Mr. Turner made any reply to this. "He didn't profess to know anything about any of the agreements." All of which goes to show that there was no agreement. I assume that Mr. Turner was willing to accommodate Mr. Hogg so far as to accompany him to Mr. Weill's office upon some plausible or partial explanation of what was wanted, and that he withdrew from all participation in Hogg's scheme when fully informed of its character. He was not a witness in the case, and, notwithstanding the fact that his client, the Farmers' Loan & Trust Company, as mortgagee of the Willamette Valley and Oregon Pacific Companies, is interested as to the property rights and interests of these companies, it has declined to appear and make defense, although served with process.

The answer of the Willamette Valley Railroad Company in this suit alleges that the tender claimed to have been made by Hogg was of $600,000, and conforms, therefore, as to price, to the recital in the mortgage deed of the two companies to the Farmers' Loan & Trust Company that the Willamette Valley Company "has acquired the right to become the owner" of the property in question, "upon payment of six hundred thousand dollars." It was not

claimed upon the hearing that the certified check which Hogg professed to tender Weill was for more than $445,000, nor is any explanation of this discrepancy attempted. Hogg, as president of the Oregon Pacific Company, the owner of nearly all the stock of the Willamette Valley Company, executed the mortgage deed containing this recital. In all that was done or professed to have been done under this power there was nothing consistent or straightforward. The sale of an option by Hogg, as Weill's attorney, to a company in fact owned by himself, without communicating the fact to his principal; the pretended tender of a certified check for $445,000; the recital in the deed by Hogg, as president of the Oregon Pacific Company, on October 1, 1880, that the Willamette Valley Company had the right to "become the owner" of the property in question upon payment of $600,000; the pretended deed by Hogg, as attorney in fact for Weill, conveying absolutely the same property on November 3, 1880, acknowledged more than two years later,—admit of no explanation consistent with fair dealing and honest motives. In more than 10 years that have elapsed since the expiration of Hogg's power, the owners of the property have expended large sums of money in complying with the conditions upon which the grant was made by congress, in defending their title in the courts, and for other necessary expenses in connection with these lands. The pretended purchaser of the property or of the option to purchase has not offered to pay any of these expenses, and does not propose to do so now. Its insolvency confesses its inability to pay such charges or purchase price of the alleged sale. The plaintiff is entitled to the relief prayed for, and such will be the decree.